## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | |
|---|---|
| PAYCARGO, LLC, ) | |
| ) | CIVIL ACTION File No.: |
| ) | 3:19-cv-00085-TCB |
| Plaintiff, ) | |
| ) | |
| vs. ) | **JURY TRIAL DEMANDED** |
| ) | |
| CARGOSPRINT LLC, ) | |
| JOSHUA WOLF, an individual, ) | |
| ) | |
| Defendants. ) | |

## FIRST AMENDED COMPLAINT

Plaintiff PayCargo, LLC ("Plaintiff" or "PayCargo"), by and through its

undersigned counsel, submits the following as its First Amended Complaint in this

action, pursuant to this Court's Order entered November 5, 2019 [Doc. 25].

PayCargo brings this action for antitrust violations, including contractual tying

arrangement in violation of 15 U.S.C. § 1 against CargoSprint LLC

("CargoSprint") and Joshua Wolf ("Wolf") (collectively "Defendants"), and

alleges as follows:

## <u>INTRODUCTION</u>

1.    PayCargo was founded in 2008 to create a web-based payment and settlement platform for the shipping and cargo industry—the PayCargo System. The company offers unique, web-based financial software solutions to carriers and shippers serving the global supply chain looking for efficient ways to expand their business. PayCargo enjoyed an initial period of growth, but Defendants have engaged in conduct that threatens PayCargo's ability to compete on the merits.

2.    This lawsuit arises from harm to PayCargo's business interests as a result of Defendants' anticompetitive conduct in violation of the United States antitrust laws.

3.    Defendants, from the inception of CargoSprint, have used their status as PayCargo customers to obtain and unlawfully leverage PayCargo's confidential information and trade secrets to solicit PayCargo's customers and business contacts, and to replicate PayCargo's software and related system functions.

4.    Specifically, PayCargo has initiated a separate legal action against these Defendants asserting that CargoSprint's SprintPay system was developed in breach of Defendants' contractual obligations to PayCargo not to copy or reverse engineer the PayCargo System, and in violation of federal trade secrets law, the

Florida Computer Abuse and Data Recovery Act, and the Florida common law of conversion.

5.      PayCargo brings this suit because CargoSprint has engaged in an illegal tying arrangement that contractually requires users of CargoSprint's SprintPass service (the "tying product") to use exclusively CargoSprint's SprintPay cargo payment system (the "tied product").  (The products and the relevant markets in which the tying product and tied product compete are defined below.)  This requirement harms competition by preventing customers from choosing the cargo payment processor that best suits their needs.

## PARTIES, JURISDICTION, AND VENUE

6.      Plaintiff PayCargo, LLC is a Delaware limited liability company authorized to transact business within the State of Florida, and with its principal place of business in Miami-Dade County, Florida at 201 Alhambra Circle, Suite 711, Coral Gables, Florida 33134.  PayCargo is a citizen of Florida and of Delaware.

7.      Defendant CargoSprint LLC is a Georgia limited liability company. CargoSprint's principal place of business is at 21 Eastbrook Bend, Suite 202 Peachtree City, GA 30269, according to documents on file with the Georgia

Secretary of State. CargoSprint's website, www.cargosprint.com/about, also

identifies that its headquarters are in Georgia:



8.    CargoSprint was originally formed as PayAirCargo LLC in 2012, but

changed its name to CargoSprint LLC on December 2, 2017, pursuant to a

settlement agreement entered into between the parties after PayCargo grew

concerned about consumer confusion arising from the junior company's extremely

similar name. As shown above, CargoSprint has a software and operations center

in Guadalajara, Mexico and a customer service and software center in Rajasthan,

India, in addition to its headquarters in Georgia.

9.    Joshua Wolf is an individual identified by CargoSprint and himself as

the founder, CEO, and sole owner of CargoSprint.

10.    Wolf is the moving force behind CargoSprint's improper actions.

11.    CargoSprint is the alter ego of Wolf and the personal affairs of Wolf

as sole or controlling owner of CargoSprint can be confused with, and/or are the

4

same as, the business affairs of CargoSprint. Upon information and belief, Wolf has disregarded CargoSprint as a corporate entity and/or has taken actions to confuse personal affairs with CargoSprint's affairs.

12.    Wolf dominates and controls CargoSprint such that his personal actions are confused with corporate actions.

13.    Furthermore, all of the violations of the antitrust laws alleged here were personally undertaken by Wolf or at his sole choice and direction, including but not limited to Defendants' anticompetitive tying arrangement.  He is individually liable to Plaintiff based on such actions, whether or not he allegedly took them on behalf of CargoSprint.

14.    Defendants are engaged in—and the conduct described in this Complaint has a substantial effect on—interstate commerce, including the transfer of funds between accounts located in different states, and the movement of cargo between different states, and between the United States and nations outside the United States.

15.    This Court has subject matter jurisdiction pursuant to at least  28 U.S.C. §§ 1331 and 1337 because this action arises under the laws of the United States as detailed below, and asserts Defendants' anticompetitive behavior in violation of the federal antitrust laws.

16.    Venue is proper in this judicial district pursuant to 15 U.S.C. § 15 because this is the judicial district in which Defendants reside, are found, or have an agent.

## GENERAL ALLEGATIONS

### The Tied Product Market:
### U.S. Cargo Payment Services

17.    After witnessing the inefficiencies and costs related to unsettled transactions between shippers and carriers, the founders of PayCargo recognized the need for an effective system of expediting payments and availability of third party credit.  As a result, on or about January 20, 2008, PayCargo began operating in the shipping and cargo industry, with the initial purpose of creating electronic payment management services for freight and cargo shipping industry participants in the United States (the "Cargo Payment Services Market").

18.    This effort resulted in a secure and effective online software platform (the "PayCargo System") to make online freight payments and collections, and to facilitate dispute resolution between shippers and carriers.

19.    The freight and cargo shipping industry involves multiple actors, including typically:

- Beneficial cargo owners

- Freight forwarders

6

- Air or sea carriers

- Terminal operators, also known as air-ground handlers

20.    A typical air or sea cargo shipment transaction has many steps, based on processes and practices that have evolved as international commerce has developed over hundreds of years of human history. In the early 21st Century, when PayCargo got its start, those steps typically were handled manually, and included:

- **Invoice Submission** – Carriers submit invoices to paying party

- **Invoice Validation** – Confirm correct rates charged, and cargo was received in good condition

- **If needed, Exception Management –** Communicate with proper party to correct exceptions found in validation process

- **Payment Approval** – Apply the paying party's internal policies to obtain permission to pay the invoice

- **Invoice Payment Accounting** – Enter payment details into the paying party's general ledger and other relevant records

- **Generate Payment –** Generate a paper check, provide credit card information to the Carrier orally or in writing, or arrange electronic transfer of funds to Carrier

- **Seek Refund for Overpayment**

- **Seek Additional Payment for Underpayment**

21.      While many of these same steps are present in any commercial transaction that may be handled through various payment services providers, the U.S. Cargo Payment Services Market has certain unique requirements, including the need to satisfy U.S. Customs regulations before cargo can be released, the multiple actors involved in the process that require payment before cargo is released to the next shipping stage, and the difficulties in enforcing payment obligations against parties in different national jurisdictions.

22.      Oftentimes, transactions are unsettled; they are stuck at the "Exception Management" step due to human error, such as a payer's typo in the check amount, or an incorrect calculation of charges by the carrier, handler or forwarder. As noted above, seeing the inefficiencies and costs related to unsettled transactions between shippers and carriers, the founders of PayCargo recognized the need for an effective system of expediting payments and availability of third party credit.

23.      At the present time, only PayCargo and SprintPay meet all of the needs of the participants in the U.S. Cargo Payment Services Market.  While carriers/cargo handlers can and do utilize more traditional payment methods such

8

as checks and (more recently) various forms of electronic payments, they find third party Cargo Payment Services providers convenient and economical because they allow freight forwarders and vendors (carriers and cargo handlers) to use common portals that assure all requirements are met and all payments are made in a standard and consistent manner, at a cost much lower that other payment methods, such as paper checks.

24.    As noted, the relevant product market for the tied product in this case is the Cargo Payment Services Market.  The relevant geographic market is the United States.  Since each country's customs mechanisms are different, Cargo Payment Services must be adapted to each nation's needs.  Moreover, payment mechanisms differ in each country and region.  For example, in Europe, electronic payments are widely accepted, compared to the U.S., which still is dependent on paper checks, escrow accounts, or short-term credit to make payments for shipping and handling services.

25.    The PayCargo System benefits shippers and vendors by, among other features, optimizing the process of making and applying payments. A paying shipper can log on to a single portal and make payments to thousands of vendors. A participating vendor not only receives electronic deposit of funds in its bank

account instead of a paper check; it also receives accurate payment application data in a format that is compatible with the vendor's accounting system.

26.     Because the PayCargo system is so efficient, over 1,000 of these vendors release the cargo within an hour after receiving the "Payment Approval" alert from PayCargo. All other vendors release cargo no later than the next morning.

27.     PayCargo introduced its new, comprehensive solution in 2008, thereby initiating the U.S. Cargo Payment Services Market. The shipping and cargo industry responded enthusiastically to PayCargo's new product solution. Today, PayCargo has thousands of vendors (carriers and cargo handlers) in its network, including major ocean carriers such as Hapag Lloyd and Hamburg Sud; air cargo providers such as Air France, LAN Cargo, Swissport, Air General, and Total Air; and hundreds of terminals and container freight stations.

28.     PayCargo has penetrated approximately 50 percent of the payers and vendors that participate in the U.S. Cargo Payment Services Market. In addition to PayCargo, the participating vendors generally also offer SprintPay as well as other payment methods to their customers, and the percentage of transactions handled through third party Cargo Payment Services Providers like PayCargo and SprintPay continues to grow.

10

29.    As a third-party electronic payment service provider, PayCargo offers one form of payment service. Other forms of payment include writing, applying and depositing paper checks; traditional wire transfers; and ACH payments. Each of PayCargo and SprintPay handles an estimated five percent of the total transaction volume of the payments market so far and such percentage is growing.

30.    CargoSprint came to the Cargo Payment Services Market several years after PayCargo. CargoSprint (then known as PayAirCargo) started as a PayCargo customer on or about August 20, 2015, masquerading as a mere freight forwarder that handles cargo on behalf of shippers.  Unbeknownst to PayCargo, CargoSprint actually utilized its position to obtain and either copy or, at the very least, reverse engineer the PayCargo software and then enter into competition with PayCargo.

31.    Selection of the confusingly similar name "PayAirCargo" was part of this strategy, but PayCargo asserted its senior trademark rights to persuade PayAirCargo to change its name. Defendants and PayCargo entered into a Settlement Agreement on December 2, 2016, that, among other things, required PayAirCargo to transfer www.PayAirCargo.com to PayCargo, and to change its corporate name, and for Defendants to cease all use of PayAirCargo by May 31, 2017.

11

32.     Since then, CargoSprint's business and marketing plans have followed in the footsteps of PayCargo in an attempt to replicate the PayCargo System in virtually all material respects.

33.     According to CargoSprint's marketing communications, its "SprintPay" program has many of the same features and benefits of PayCargo's payment platform. For example, in discussing electronic payments through "SprintPay," CargoSprint states:

- "Most of our payments are delivered instantly and electronically. Vendor receives payment information alert automatically. Other vendors are paid same day with check via messenger."

- SprintPay generates reports that include remittance data and provides payers the ability to dispute charges.

- CargoSprint also offers SprintPay as a tool available for white label integration, presumably through an application programming interface ("API").

All of these claimed features were first key features of the PayCargo System.

34.     CargoSprint also advertises a "CargoSprint Credit" program, which appears to be a derivative of the "PayCargo Credit" program PayCargo offers.

**Tying Product Market:**
**Dock Delivery Scheduling Services**

35.    In 2018, CargoSprint introduced a new software product called

"SprintPass," which offers coordination services for scheduling cargo pick-up by

freight and cargo shippers and handlers at the warehouse dock (the "Dock Delivery

Scheduling Services Market").   The SprintPass product is described by

Defendants at https://cargosprint.com/sprintpass.

36.    Specifically, CargoSprint describes SprintPass as a "Pickup & drop-

off system . . . designed to connect forwarders, cargo facilities and trucking

companies to optimize the pickup & drop-off process, from start to finish."

37.    Cargo that arrives from overseas, and particularly air freight (which

generally involves smaller shipment lots), is delivered to warehouses at airports for

pick-up by trucks and other vehicles.  CargoSprint's website acknowledges that

this process, even when optimized, has multiple steps and actors.

38.    Other factors complicate the scheduling of deliveries, including the

necessity of obtaining customs clearance before cargo is released to the freight

forwarders and the need to assure payment of storage and cargo handling charges.

These factors can cause delays at the dock and further contribute to the overall

disorganization of pick-up scheduling. The SprintPass system allegedly solves

these problems, when integrated with a Cargo Payment Services system.

39.    The Dock Delivery Services Market is the relevant product market for

the tying product in this case, as further described below.   The relevant geographic

market is again the United States.  Customs clearance is an important element of

Dock Delivery Services Market, and customs clearance obviously varies from

country to country.  Moreover, overseas potential competitors have made no

noticeable effort to enter the U.S. market.

40.    Most cargo handlers and freight forwarders have historically made do

with internal processes for scheduling pick-ups, often no more sophisticated than

first-in first-out deliveries or round-robin priorities. Accordingly, cargo pick-up

often can involve substantial scheduling issues, with long lines of trucks waiting

their turn to make pick-ups, particularly at congested, high volume locations.

These self-help procedures should not be considered a part of the Dock Delivery

Services Market any more than people choosing to wash their own dishes in a sink

should be viewed as part of the dishwasher market.

41.    Even if some carrier or cargo handler had a sophisticated system (and

existing congestion at high volume airports suggests that they do not), none of

these systems is sold commercially.  They are thus not available to the many cargo handlers that lack the capabilities to develop such systems for themselves

42.    PayCargo has recently learned the method by which the SprintPass came to offer the SprintPass software.  Commencing in the early 2000's Lufthansa issued an RFP for the development of software to solve the Dock Delivery Services problem for its own internal use.  A company called TurretLabs won the RFP and developed a comprehensive software solution for use by Lufthansa. Development of this software took around two and a half years.

43.    The Lufthansa software integrated modules that allowed cargo handlers to integrate customs release notifications, payment of all charges relating to the cargo, and prioritization of shipments based on factors such as emergency need, perishability, and value of customers.  The result was substantially smoother scheduling, with much reduced wait times and avoidance of last minute delays. The software functioned in substantially the same manner as the later-developed SprintPass, with most of the same functions and features.

44.    Upon information and belief, CargoSprint obtained access to this software from Lufthansa, again masquerading as a freight forwarder as it did when signing up for the PayCargo System.  CargoSprint then undertook to copy or, at the very least, to reverse engineer this software for commercial sale.

15

45.    There is little or no existing competition for the SprintPass software at present.  As noted, most cargo handlers and freight forwarders have makeshift internal processes that do not solve most of the basic scheduling problems indicated above.

46.    TurretLabs is now a potential competitor in this market.  The contract between Lufthansa and TurretLabs provided that TurretLabs would develop the system for Lufthansa and Lufthansa would have exclusive rights to use the system for an initial period of years. At the expiration of that period, TurretLabs would be free to market the system to others.

47.    After the exclusivity period expired in around 2017, TurretLabs spent about two years updating the system and making it suitable for commercial sale as a product called Dock enRoll.  However, it has not yet made any sales.  The most significant difficulty it faces in launching competition in the U.S. is that, by the time TurretLabs was finally ready to offer Dock enRoll, it found that SprintPass was already offering its copycat of the Dock enRoll product for free, making effective competition impossible.  The SprintPass product presumably was developed at a much lower cost than the historic Lufthansa system and its latest incarnation, Dock enRoll, since it is essentially a copy of the Dock enRoll system.

48.    There are a couple of other potential competitors in Europe that might offer some of the same features but, upon information and belief, none of them has made any significant efforts to enter the U.S. market. Thus, at the present time, CargoSprint has no effective competitors in the Dock Delivery Services Market.

## CargoSprint's Antitrust Violations

49.    A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. The essence of illegality in a tying arrangement is the wielding of monopolistic leverage so that a seller exploits its dominant position in one market to expand its empire into the next.

50.    A tying arrangement harms competition not only by rendering competitors unable to compete with the violator, but also by denying customers their choice of suppliers in the tied product market.

51.    CargoSprint has undertaken to tie its SprintPay product in the U.S. Cargo Payment Services Market to its sale of its SprintPass product in the U.S. Dock Delivery Scheduling Market.

52.    Upon information and belief CargoSprint is the only current supplier of comprehensive software in the U.S. Dock Delivery Scheduling Market.  As

17

such, CargoSprint has substantial market power in this market that has allowed it to impose upon vendor and payers its requirement that they use only the SprintPay product to pay for shipments that are managed using SprintPass.

53.    CargoSprint's market power in the U.S. Dock Delivery Scheduling Market is particularly strong in the sub-market of high volume locations in which long delays and congestion are a substantial problem.

54.    CargoSprint's tying arrangement has restrained a substantial amount of commerce in the Cargo Payment Services Market and particularly in the market at high cargo volume airports.  For example, upon information and belief, SprintPass (and hence exclusively SprintPay) is now in use at major air freight terminals that serve the international airports in San Francisco, Los Angeles, Atlanta, Newark, and Chicago (O'Hare).

55.    The total number of payments to those SprintPass terminals that have been processed using SprintPay is uniquely known by Defendants and those terminals. Upon information and belief, however, in Los Angeles alone, SprintPay is handling approximately 50,000 transactions per month. At ten dollars per transaction, at that location alone Defendants are earning an additional half million dollars of revenue every month.

18

56.    Defendants' conduct limits PayCargo's ability to compete and denies customers their choice of third-party electronic payment service provider throughout the U.S. Cargo Payment Services Market.  The effect is particularly intense in the submarket for high-volume locations, where the tying arrangement effectively precludes PayCargo from competing. In such locations, the SprintPass product is particularly valuable because of the substantial congestion and delays that accompany large numbers of deliveries and pick-ups. Defendants' tying arrangement alters the competitive landscape of the Cargo Payment Services Market such that competition in the tied product market is no longer based on a producer's ability to provide efficient Cargo Payment Services.

57.    PayCargo has approached multiple large actors in the freight and cargo industry currently served by SprintPass and SprintPay about using PayCargo's Cargo Payment Services. Several of those actors – well-known air-ground handlers and terminal operators – have complained to PayCargo representatives that they cannot use PayCargo's Cargo Payment Services because of Defendants' contractual imposition of a tying arrangement between the SprintPass and SprintPay services.

58.    These vendors are harmed not only by being denied their preference for providers of U.S. Cargo Payment Services, but also by the fact that the

SprintPay Cargo Payment Services offered by CargoSprint are inferior to the services offered by PayCargo.

59.    In particular, under this tying arrangement, the freight forwarder or beneficial cargo owner who is forced to use SprintPay to pay the fees charged by the vendor suffers economic harm.  Along with losing freedom of choice, the payer is forced to pay double the per-transaction fee that PayCargo charges – ten dollars instead of five dollars.  The fact that vendors would agree to exclusivity and hence decline to offer a product to their customers costing half as much is a testament to the market power that CargoSprint possesses in the tying product market.

60.    Furthermore, the PayCargo System offers a distinct financial advantage to payees over the SprintPay system, in that PayCargo offers the ability to cause immediate payment to the cargo handler, whereas SprintPay holds funds from the freight forwarder and uses the "float" to conduct its own business. Customers who would like to receive or be able to offer immediate payment are nevertheless required to accept deferred payment as a condition of obtaining the valuable CargoSprint Dock Delivery Scheduling product.

61.    PayCargo has suffered substantial injury and damages as a result of Defendants' anticompetitive tying arrangement, including losing the ability to offer its services to the principal cargo handlers at all of the high volume airports

mentioned above. PayCargo anticipates losing substantially more business in the future.  As a competitor harmed as a result of anticompetitive conduct, PayCargo has suffered antitrust injury and has standing to assert its antitrust claim herein.

62.    The conduct alleged herein takes place in and affects interstate commerce.  Both CargoSprint and PayCargo offer their services and software throughout the United States, and the transactions they process frequently pass between accounts location in different states.  Their activities also substantially affect international cargo shipment commerce, and international commerce is treated as interstate commerce under the antitrust laws.

63.    There are separate markets for SprintPass and SprintPay: the two services are not substitutes.  This is evidenced by Defendants' offering of SprintPay as a stand-alone service, without the use of SprintPass.

64.    There is no valid technological or business justification for Defendants' tying arrangement. Defendants tout on the CargoSprint website that CargoSprint can integrate its computer systems with other preexisting computer systems, including payment systems. Wolf has even confirmed to PayCargo that there are no technical barriers to integration.

65.    Wolf, as CEO of CargoSprint, has authorized, ordered, and participated in the anti-competitive tying conduct described above.

21

**COUNT I**
**CONTRACT IN RESTRAINT OF TRADE**
**15 U.S.C. § 1**
(Against both Defendants)

66.    PayCargo re-alleges and incorporates by reference paragraphs 1-65 as if fully set forth herein.

67.    This Count I is an action against Defendants for a contractual tying arrangement in violation of 15 U.S.C. § 1.

68.    Defendants offer and have sold SprintPass and SprintPay throughout the United States for use in interstate commerce. Their services also affect substantial cargo shipment transactions that take place in international commerce between the United States and countries throughout the world.

69.    Defendants have substantial market or economic power through SprintPass in the Dock Delivery Scheduling Market because it is the only stand-alone service available in the United States that offers comprehensive and effective software for such services.

70.    Defendants have used their market and economic power and dominance in the Dock Delivery Scheduling Services Market to contractually require users of SprintPass with Cargo Payment Services needs to use SprintPay—

the tied service—to the exclusion of all other services in the Cargo Payment
Services Market.

71.    Defendants' actions have harmed competition by denying Plaintiff the
opportunity to compete and by denying customers their choice of providers of
Cargo Payment Services.   For example, customers are denied the ability to utilize
both SprintPass and the superior features of PayCargo that can eliminate or reduce
customer's need to advance capital or assume credit risk, allow for overnight or
even same day cargo release, all at a fee that is half of that charged by Defendants
for SprintPay.

72.    SprintPass and SprintPay constitute separate products sold in separate
markets. CargoSprint offers SprintPay as a stand-alone service.

73.    Defendants' illegal anticompetitive tying arrangement affects a not
insubstantial volume of interstate commerce in the Cargo Payment Services
Market. Upon information and belief, in the Cargo Payment Services Market
CargoSprint has gained at least $500,000 per month in transaction revenue just
from the single air cargo terminal at Los Angeles International Airport through use
of its tying arrangement described herein.

74.    Defendants' tying arrangement constitutes a per se violation of the
antitrust laws.

23

75.    In the alternative, the tying arrangement constitutes an unreasonable restraint of trade under the rule of reason.  The arrangement substantially harms competition and has no countervailing pro-competitive valid business justification.

## PRAYER FOR COSTS AND ATTORNEYS FEES

Plaintiff PAYCARGO, LLC requests an award of reasonable costs and attorney fees pursuant to 15 U.S.C. § 15 and any other applicable basis for costs and attorney's fees based upon the claims brought herein.

## REQUEST FOR JURY TRIAL

Plaintiff PAYCARGO, LLC requests jury trial of any matter so triable as a matter of right.

## PRAYER FOR RELIEF

WHEREFORE, for all the forgoing reasons, Plaintiff PAYCARGO, LLC requests this Honorable Court grant relief in the following manner:

a)    Preliminary and later permanent injunction under 15 U.S.C. § 26 against Defendants and their servants, employees, and those people in active concert or participation with Defendants from engaging in anticompetitive conduct in violation of the antitrust laws of the United States;

b)    Judgment against Defendants for violation of 15 U.S.C. § 1, including threefold damages, simple interest on actual damages and the cost of the suit;

c)      Treble damages, attorneys' fees and all other remedies under 15 U.S.C.

§ 15;

d)      Any and all other relief that this Honorable Court deems just.

DATED this 9th day of December, 2019.

Respectfully submitted,

*/s/ **Ann G. Fort**_____*

EVERSHEDS SUTHERLAND (US) LLP

Ann G. Fort (Ga. Bar 269995)
James R. McGibbon (Ga. Bar 492350)
(Notice of Appearance to be filed)
999 Peachtree St. NE, Suite 2300
Atlanta, GA 30309
Phone: 404-853-8000
Fax: 404-853-8806
Email: annfort@eversheds-sutherland.com

Cameron C. Murphy
Florida Bar No. 0125086 (*pro hac vice*
application forthcoming)
999 Peachtree St. NE, Suite 2300
Atlanta, GA 30309
Phone: 404-853-8000
Email: cameronmurphy@eversheds-
sutherland.us

*Counsel for Plaintiff PAYCARGO, LLC*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing document complies with LR 7.1(D) NDGa. The font and point size used in preparing the foregoing is Times New Roman, 14-point.

This 9th day of December, 2019.

*/s/ Ann G. Fort*

Ann G. Fort

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

This 9th day of December, 2019.

*/s/ Ann G. Fort*

Ann G. Fort